E-SERVED
10/06/04
06:22 PM ET
Baycol MDL 1431

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: BAYCOL PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>Shaw v. Bayer Corporation,<br>Case No. 02-CV-433 | MDL No. 1431 (MJD)<br><br>**PLAINTIFF DOUGLAS SHAW'S NOTICE OF MOTION AND MOTION FOR LEAVE OF COURT TO AMEND COMPLAINT; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES** |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on October 6, 2004, plaintiff Douglas Shaw hereby moves for (1) leave of this Court pursuant to Rule 15(a) of the Federal Rules of Civil Procedure to amend his Complaint and (2) for an order deeming the amended complaint as the operative complaint for the purpose of Plaintiff's motion to remand to state court. The Honorable Michael J. Davis at the United States District Court for the District of Minnesota, U.S. Courthouse, Suite 14E, 300 South Fourth Street, Minneapolis, Minnesota 55415, will rule on this Motion without a hearing.

This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities set forth below, the proposed Amended Complaint attached

E-SERVED 10/06/04 06:22 PM ET Baycol MDL 1431

hereto, the reply to be filed, any exhibits attached to this motion, and the papers and pleadings on file with the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

### A. The Initial Complaint

On September 7, 2001, plaintiff Douglas Shaw filed a complaint asserting a claim for violations of the California Business and Professions Code § 17200, et seq. (the "UCL") and for unjust enrichment arising out of the marketing and selling of the cholesterol-reducing drug Baycol by defendant Bayer Corporation (the "Complaint") in San Francisco County Superior Court. Bayer, a corporation organized and existing under the laws of the State of Pennsylvania, is a wholly owned subsidiary of Bayer A.G., through which Bayer A.G. runs its United States operations. Complaint, ¶ 2.

Defendant Bayer Corporation filed its Notice of Removal on October 5, 2001. Bayer asserts diversity jurisdiction under 28 U.S.C. § 1332. Notice, ¶ 2. The action was removed to the United States District Court for the Northern District of California.

On October 26, 2001, plaintiff filed a motion to remand to the California Superior Court. Before the court could take the motion under consideration, on November 26, 2001, the district court entered its order staying all proceedings in Plaintiff's action pending the ruling of the Judicial Panel on Multidistrict Litigation on the petitions to establish a single district for the coordination of pretrial proceedings for cases alleging injuries arising from the ingestion of Baycol. The MDL Panel then transferred this case to the MDL Court.

On March 18, 2002, Defendant filed an answer to the Complaint.

E-SERVED
10/06/04
06:22 PM ET
Baycol MDL 1431

**B. Remand Motion**

On February 13, 2004, Plaintiff filed a Motion to Remand this action to the Superior Court of California on the ground that the requirements for diversity jurisdiction are not present. Both sides have fully briefed the Motion. The Motion to Remand is still pending before this Court.

**C. Motion for Relief from PTO 114, Parts I(A) and I(B)**

On May 25, 2004, Plaintiff filed a motion for relief from Pretrial Order No. 114, Parts I(A) and (B) (hereinafter, "PTO 114"), which require each plaintiff to "serve a Rule 26(a)(2) case-specific report from a medical expert attesting that Baycol caused the plaintiff to suffer injuries or damages" or to "serve a letter and supporting documents subsequently followed by a case-specific expert report." Plaintiff argued that neither his UCL nor unjust enrichment claim required proof of injury or a showing that Plaintiff obtained no benefit from taking Baycol.

On August 9, 2004, the Court denied Plaintiff's request for relief on the ground that to recover on a claim for unjust enrichment, Plaintiff must "show receipt of a benefit and the unjust retention of such benefit at the expense of plaintiff." Order at 2. Noting that California requires case specific experts to prove the type of injury at issue in Baycol cases, the Court concluded that Plaintiff failed to show that an expert will not be required to prove his claims.

By letter dated October 6, 2004, Plaintiff requested reconsideration of this order pursuant to Local Rule 7.1(g).

E-SERVED 10/06/04 06:22 PM ET Baycol MDL 1431

## II. LEGAL STANDARD

Rule 15(a) of the Federal Rules of Civil Procedure provides that where a party seeks leave of court to amend the party's pleading, "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15. Under this liberal pleading standard, courts should normally grant leave to amend absent good reason for a denial. Thompson-El v. Jones, 876 F.2d 66, 67 (8th Cir. 1989). A motion to amend should be denied "only if it asserts clearly frivolous claims or defenses." Becker v. Univ. of Nebraska at Omaha, 191 F.3d 904, 907 (8th Cir. 1999).

## III. DISCUSSION

Plaintiff seeks to eliminate from his Complaint the unjust enrichment claim because it now appears that the unjust enrichment claim adds nothing to the UCL claim, yet carries a higher burden of proof. Additionally, subsequent to filing the complaint a California Court of Appeal held that California does not recognize a separate cause of action for unjust enrichment. See Melchior v. New Line Productions, Inc., 106 Cal. App. 4th 779, 793 (2003). Plaintiff also added additional facts supporting his claim for disgorgement under the UCL and refocused the class definition to include California residents and their insurers.

The UCL provides a broad remedy that does not require proof of either individual injury or the lack of receipt of benefit. Under the UCL, one need only show that "members of the public are likely to be deceived." Bank of the West v. Super. Ct., 2 Cal.4th 1254, 1267 (1992). In addition, entitlement to statutory remedies of injunction, restitution, and disgorgement of a defendant's wrongful gains requires only that a plaintiff establish that defendant engaged in an unfair business practice. Fletcher v.

E-SERVED
10/06/04
06:22 PM ET
Baycol MDL 1431

Security Pacific Nat'l Bank, 23 Cal.3d 442, 453 (1979). Allegations of actual deception, reasonable reliance, and damages are unnecessary. Committee on Children's Television, Inc. v. General Foods Corp., 35 Cal.3d 197, 211 (1983). California courts construing the UCL have made clear that a UCL plaintiff need not prove direct injury as a result of unfair or unlawful business practices. Saunders v. Sup. Ct., 27 Cal.App.4th 832, 839 (1994).

Plaintiff alleges that Defendant began selling Baycol in the United States in 1997. Complaint ¶ 12. In October 1999, the FDA informed Defendant that the agency had concluded that Defendant had disseminated false and misleading advertisements regarding Baycol and failed to present information regarding the side effects and contraindications from taking Baycol. Complaint ¶¶ 15, 16. Defendant concealed the FDA's findings regarding the dangers of Baycol and continued selling the drug. Complaint ¶ 17. Not until August 8, 2001, did Defendant finally announce that it would withdraw Baycol from the market due to reports of fatalities caused by taking Baycol. Complaint ¶ 20. Plaintiff purchased Baycol beginning in April 2001, until its withdrawal from the market in August 2001. Complaint ¶ 1.

The UCL's remedy of disgorgement requires a defendant to relinquish all profits obtained in connection with an unlawful or unfair business practice. Wershba v. Apple Computers, Inc., 91 Cal.App.4th 224, 242 (2001). A determination of the amount of ill-gotten gains need not take into account the benefit, if any, plaintiff received from the product purchased. The remedy of disgorgement compels a defendant to surrender all money obtained through unlawful or unfair business practices even though not all is to be restored or returned to the person from whom it was obtained. Kraus v. Trinity Mgmt.

E-SERVED
10/06/04
06:22 PM ET
Baycol MDL 1431

Servs., Inc., 23 Cal.4th 116, 127 (2000). Thus, a claim for disgorgement of wrongfully obtained profits also requires no determination of the actual benefit obtained by a plaintiff who purchased and used Baycol. Accordingly, unlike for a claim of unjust enrichment, there is no need for an expert to attest to the efficacy of the drug or its potential benefits, if any, obtained by a plaintiff. Rather, a determination of the amount of wrongfully gained profits will require only an examination of Defendant's accounting records to determine the true cost to Defendant of manufacturing, marketing, and selling the product, in relation to the total revenue received from the sale of Baycol.

## IV. CONCLUSION

For the foregoing reasons, and because justice so requires, Plaintiff respectfully requests that the Court grant Plaintiff (1) leave to amend his Complaint and (2) an order deeming the amended complaint as the operative complaint for the purpose of Plaintiff's motion to remand to state court.

Dated: October 6, 2004

**GREEN & JIGARJIAN LLP**

By: Robert S. Green

Jenelle Welling
235 Pine Street, 15th Floor
San Francisco, CA 94104
Telephone: (415) 477-6700
Facsimile: (415) 477-6710

E-SERVED
10/06/04
06:22 PM ET
Baycol MDL 1431

## CERTIFICATE OF SERVICE

I, Leslie R. Cuesta, hereby declare as follows:

I am employed by Green & Jigarjian, A Limited Liability Partnership, 235 Pine Street, 15th Floor, San Francisco, California 94104. I am over the age of eighteen years and am not a party to this action. On October 6, 2004, the within document was electronically served to counsel of record via Verilaw:

**PLAINTIFF DOUGLAS SHAW'S NOTICE OF MOTION AND MOTION FOR LEAVE OF COURT TO AMEND COMPLAINT; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES**

I declare under penalty of perjury under the laws of the State of California that the above is true and correct, executed October 6, 2004, at San Francisco, California.

Leslie R. Cuesta

E-SERVED
10/06/04
06:22 PM ET
Baycol MDL 1431

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| IN RE: BAYCOL PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>Shaw v. Bayer Corporation,<br>Case No. 02-CV-433 | MDL No. 1431 (MJD) |

**AMENDED CLASS ACTION COMPLAINT**

Plaintiff, by his attorneys, brings this action on behalf of himself and a class of similarly situated California residents, and alleges as follows:

## I. PARTIES TO THE ACTION

1. Plaintiff Douglas Shaw was a resident of San Francisco, California, at the time of the filing of the first complaint in this action.

2. Defendant Bayer Corporation, a wholly owned subsidiary of Bayer A.G., through which Bayer A.G. runs its United States operations, is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205. Bayer Corporation also has facilities in Berkeley and Emeryville, California. Defendants Bayer A.G. and Bayer Corporation are collectively referred to herein as "Defendants" or "Bayer."

E-SERVED
10/06/04
06:22 PM ET
Baycol MDL 1431

## II. JURISDICTION AND VENUE

3. Jurisdiction is proper in the California Superior Court pursuant to the California Constitution, Article XI, section 10, and under California Code of Civil Procedure section 410.10 because Defendants transact business and have committed the acts complained of in California. No part of this Complaint is brought under federal law. In addition, neither Plaintiff nor any individual member of the putative Class has suffered actual damages of $75,000 or more, exclusive of interest and costs.

4. Defendant improperly removed this action to the United States District Court for the Northern District of California on the basis of diversity jurisdiction under 28 U.S.C. § 1332, from where it was transferred to this Court.

5. On February 13, 2004, Plaintiff filed a motion to remand this action to California Superior Court on the ground that Defendant has failed to establish the requisite amount in controversy requirement for diversity jurisdiction. The motion is pending.

6. Venue is proper in San Francisco County because Defendants advertised and conducted business in this county and the Plaintiff resided in this county at the time of the conduct complained of.

## III. CLASS ACTION ALLEGATIONS

7. Plaintiff brings this action on behalf of himself and a Class consisting of all California residents and their agents and insurers who purchased the drug Baycol between February 18, 1998, when the drug was introduced, and August 8, 2001, when Bayer removed Baycol from the market (the "Class Period"), excluding individuals who suffered personal injury caused by ingesting Baycol.

E-SERVED 10/06/04 06:22 PM ET Baycol MDL 1431

8. Numerosity of the Class - Members of the Class are so numerous that their individual joinder herein is impracticable. Plaintiff is informed and believes, and on that basis alleges, that several thousand Californians purchased Baycol.

9. Existence and Predominance of Common Questions of Fact and Law - Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting only individual Class members. These common legal and factual questions include:

(a) Whether Defendant engaged in unlawful, unfair, or fraudulent business practices by concealing the risks associated with using Baycol and failing to provide adequate warnings concerning those risks;

(b) Whether Defendant's overall advertising campaign had the capacity to deceive purchasers of statin drugs about the safety and efficacy of Baycol;

(c) Whether and when Bayer learned about risks associated with Baycol that caused it to remove Baycol from the market; and

(d) Whether Defendant's violation of California's UCL justifies disgorgement of revenues received from sales of Baycol to or on behalf of California consumers, and if so, in what amounts.

10. Typicality - The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the members of the Class purchased Baycol during the Class Period.

11. Adequacy - Plaintiff is an adequate representative of the Class because his interests do not conflict with those of its members, and he has retained counsel competent

E-SERVED 10/06/04 06:22 PM ET Baycol MDL 1431

and experienced in complex class actions, including unfair competition litigation. Plaintiff and his counsel will fairly and adequately protect the interests of the Class.

12. Superiority - The class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and the other members of the Class. It would be virtually impossible for the members of the Class to individually redress the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expenses to all parties, and to the court system, particularly in cases involving complex legal and factual issues such as this one. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## IV. FACTUAL BACKGROUND

13. Plaintiff purchased and medicated with Baycol, beginning in April 2001. Plaintiff stopped using Baycol in August 2001 after Plaintiff received a call informing him that Baycol was no longer available and that Plaintiff should see his doctor immediately to change his prescription. Plaintiff's physician has since prescribed Pravachol.

14. Bayer developed and manufactured the drug Baycol (generically named cerivastatin sodium) and began selling it for use in the United States in 1998.

15. Baycol is a member of a class of cholesterol lowering drugs that are commonly referred to as "statins." Statins are prescribed to patients who have high blood

E-SERVED 10/06/04 06:22 PM ET Baycol MDL 1431

pressure and heart disease. Statins lower cholesterol levels by blocking a specific enzyme in the body that is involved in the synthesis of cholesterol.

16. Baycol was an unnecessary drug because at the time of its launch there were more effective statins in the market that had completed more rigorous testing procedures. Nevertheless, Bayer focused its efforts on achieving market share by replacing other statins already on the market. Bayer set and realized budgets for obtaining market share. One important aspect of Bayer's strategy was to convince HMO's or "Managed Care Formularies" to switch from other statins to Baycol. To meet its sales targets, Bayer used marketing materials that overstated Baycol's efficacy and concealed information about the safety risks of this product.

17. On June 26, 1997, the U.S. Food and Drug Administration ("FDA") approved Bayer's application to market Baycol in doses up to 0.3 mg in the United States. The approval was granted based on clinical trials involving only 3,000 people; far less than the number of people involved in clinical trials for other statins.

18. Shortly after receiving FDA approval, Bayer aggressively began to market the drug, promoting Baycol as more effective than other statins, such as Pravachol, in reducing cholesterol and less expensive.

19. Bayer knew, however, that Baycol was less effective at the approved dosages than other statins already on the market. In response to Bayer's request for comments on a proposed press release regarding Baycol, the FDA, in a letter to Bayer dated February 6, 1998, specifically cautioned Bayer against making efficacy claims for Baycol as compared to other statins. The Medical Officer for the FDA at the Center for Drug Evaluation and Research also informed Bayer that Baycol was minimally effective

E-SERVED
10/06/04
06:22 PM ET
Baycol MDL 1431

in lowering serum cholesterol levels when compared with other statins already on the market.

20. In addition to being less effective in lowering cholesterol, Baycol was found to be associated with serious medical conditions known as myositis (inflammation of a muscle), myopathy (any abnormal condition or disease of the muscular tissues), and rhabdomyolysis (an acute, fulminating, potentially fatal disease of skeletal muscle).

21. In patients with rhabdomyolysis, the cellular membranes of the muscle tissue are breached, releasing myoglobin and potassium into the bloodstream from inside the muscle cells. If the level of myoglobin in the blood reaches sufficient concentrations, complete kidney failure can result. This results in death in approximately half of the cases. In addition, if enough potassium from leaking muscle tissue enters the bloodstream, all electrical activity in the body may be disrupted, including those regulating contraction of the heart, leading to heart failure.

22. Through the experience of early clinical trials, Bayer became aware of the propensity of Baycol to cause rhabdomyolysis with greater frequency than other statins.

23. Adverse event reports to the FDA of rhabdomylolysis from the period November 1, 1997, to March 31, 1998, showed four times as many incidents of rhabdo as other statins, particularly in patients using Baycol in combination with gemfibrozil. Even among those who had not taken gemfibrozil, however, the number of adverse events was substantially higher for Baycol than for other statins.

24. Bayer originally planned to market Baycol as a "simple and safe" alternative to other statins. But early clinical trials demonstrated that Baycol was not as safe as Bayer had hoped. A.N. Karabelas, Vice President of SmithKline Beecham, wrote

E-SERVED 10/06/04 06:22 PM ET Baycol MDL 1431

in a letter dated June 27, 1997, to David R. Ebsworth, Executive Vice President of Bayer Pharmaceutical Division, in which he warned of "[s]erious concerns regarding the emerging profile of cerivastatin . . . . Now more than a year after working with those original assumptions and developing sales forecasts, we have learned more about cerivastatin and, in light of these changes, now evolved . . . [s]imple and safe no longer appears to be a viable promotional platform" (emphasis in original).

25. Nevertheless Bayer proceeded aggressively with its false and misleading marketing campaign. In 1998, Bayer stated in the Physicians' Desk Reference ("PDR"), "Warnings" section, that "[r]are cases of rhabdomyolysis with acute renal failure secondary to myoglobinuria have been reported with other [similar drugs]." (Emphasis added.) This warning was misleading because Bayer's own study showed that the occurrence of rhabdomyolysis was less "rare" than Bayer suggested. The disease occurred in more than 7 percent of those taking Baycol. Bayer's promotional materials focused on FDA approvals and other representations that created the impression of extensive successful testing of this product while concealing the important information actually learned or which could have been learned in appropriate and reasonable testing procedures.

26. In addition to rhabdomyolosis, Baycol also lowers the liver's ability to produce the coenzyme Q10 (CoQ 10). CoQ10 is essential in the human body for cells to produce energy. The reasons for CoQ10 depletion include the increased use of drugs that alter the cholesterol biosynthetic pathway, and therefore inhibit the biosynthesis of other vital products of this pathway, including CoQ10. Baycol is in the class of drugs which deplete CoQ10.

E-SERVED 10/06/04 06:22 PM ET Baycol MDL 1431

27. The risks of CoQ10 depletion includes congestive heart failure, high blood pressure, angina, mitrovalve prolapse, stroke, cardiac arrhythmias, cardiomyopathy, lack of energy, gingivitis and generalized weakening of the immune system.

28. Defendants knew as early as 1994 that Baycol depleted CoQ10 levels, yet this effect was not disclosed in its promotional materials notwithstanding Bayer's knowledge that it can lead to rhabdomylosis, mayalgia, myopathy and/or congestive heart failure.

29. Although Bayer became aware in 1998 of reported deaths associated with the use of Baycol, it failed to disclose this information to the FDA or to other governmental regulators, the medical community, or consumers.

30. Despite growing evidence from clinical trials and the experience of patients taking Baycol that those taking the drug suffered higher than normal levels of adverse effects, Bayer continued to seek approval of higher dosages at 0.4 mg and 0.8 mg. To this end, Bayer undertook additional studies to demonstrate the safety and efficacy of Baycol. However, the studies demonstrated that adverse events increased in frequency and severity with an increase in the dosage amount. Bayer did not disclose, for example, that its analyses showed problems with monotherapy.

31. Under direction from the FDA to provide stronger warnings of the risk of rhabdomyolysis, Bayer revised the entry in the PDR "Adverse Reactions" section. Although the entry in the PDR advised doctors that the events of rhabdomyolyis and other conditions have been "reported" since the market introduction of Baycol, it continued to downplay the relationship between Baycol and these illnesses, insisting that

E-SERVED 10/06/04 06:22 PM ET Baycol MDL 1431

"a causal relationship to the use of Baycol cannot be readily determined due to the spontaneous nature of reporting of medical events, and the lack of controls."

32. In May 1999, the FDA approved the 0.4 mg dosage of Baycol. Bayer immediately launched an advertising campaign touting Baycol's performance and value. The apparent success of Bayer's marketing campaign is evident in the fact that Bayer's fiscal 2000 sales of Baycol/Lipobay reached approximately $586 million.

33. Despite increasing reports of adverse effects, such as rhabdomyolysis, advertisements for Baycol aimed at physicians and managed care providers failed to adequately disclose the risks associated with using Baycol and continued to characterize cases of rhabdomyolysis as "rare."

34. On October 25, 1999, the FDA sent Bayer a letter concerning Bayer's improper practice of disseminating misleading promotional materials about Baycol. The FDA cautioned Bayer that the FDA had "become aware of promotional material for Baycol (cerivastatin sodium) that is false, lacking in fair balance, and otherwise misleading." According to the FDA, Bayer's promotional material was "misleading . . . because it implies, without substantial evidence, that Baycol is superior to other competing products . . ." The FDA noted that Bayer's promotional materials were misleading because they also implied that Baycol held "a clinical advantage versus 'other statins' that is unsubstantiated."

35. The FDA's October 25, 1999, letter also noted that Bayer was touting Baycol's efficacy but concealing or downplaying its side effects: "The presentation of risk information . . . lacks fair balance. Promotional materials may be lacking in fair balance, or otherwise misleading if they fail to present information relating to side effects

E-SERVED 10/06/04 06:22 PM ET Baycol MDL 1431

and contraindications, with a prominence and readability reasonably comparable to the presentation of efficacy information."

36. The October 25, 1999, FDA letter directed Bayer to "immediately cease" its deceptive advertising, which the FDA noted was in violation of the Federal Food, Drug, and Cosmetic Act and its implementing regulations. Despite this demand, Bayer continued promoting the use of Baycol and downplaying the risks associated with the drug.

37. Bayer's parent company, Bayer A.G., was a subscriber to the Arznei Telegram, a drug safety information bulletin issued in Germany, which had received numerous reports of adverse events by the fall of 2000. In March 2001, the bulletin published a warning concerning the use of Baycol. In addition, the German health ministry accused Bayer A.G. of grave errors in its information policy regarding the side-effects of Baycol, charging Bayer with having withheld information on the adverse effects of the drug from the German Institute for Drugs and Medical Products.

38. In early 1999, Bayer obtained information from the FDA's Adverse Event Reporting System containing adverse event reports for statins. Bayer learned that among the six major statins on the market, the reported incidents of rhabdomyolysis was highest among those who took Baycol.

39. Bayer was also aware of a study of Baycol dated September 7, 1999, which reported adverse events in 6 percent of the study's sample group for both 0.4 mg and 0.8 mg doses – a total of 60 persons from a sample of less than a thousand. The study reported that "[t]here was a greater rate of discontinuation [of participation in the study] due to serum CL elevations in the cerivastatin [Baycol] groups . . . . Several patients

E-SERVED
10/06/04
06:22 PM ET
Baycol MDL 1431

discontinued due to muscle-related symptoms." Adverse events "occurred more frequently in the cerivastatin 0.8 mg group."

40. In late 1999, Bayer took out multi-page advertisements in medical journals touting the effectiveness of the 0.4 mg dosage of Baycol as compared with its competition. Notably, the advertisement also stated that Baycol provides "The same proven safety and tolerability you've come to expect. Side effects are usually mild and transient and similar to placebo." The advertisement also contained the following "Important Safety Information: Baycol is contraindicated in patients with hypersensitivity to any component of this medication . . . . Rare cases of rhabdomyolysis have been reported with cerivastatin and with other drugs in this class . . . ."

41. Bayer's continued use of the phrase "rare cases" in regard to incidents of rhabdomyolysis was misleading at best and dangerous at worst. Bayer's own internal report covering the period June 26, 1997, to September 30, 1999, showed that rhabdomyolysis occurred at a frequency of 7.37 percent.

42. Even despite the growing evidence of the risks associated with Baycol, Bayer's July 2000 package insert, which was modified to address the combined use of Baycol and gemfibrozil, continued to soft-pedal the risk of Baycol by stating that "a causal relationship" between the use of Baycol and rhabdomyolysis "cannot be readily determined."

43. In the January through July 2001 issues of Arteriosclerosis, Thrombosis, and Vascular Biology, and in numerous other journals, Bayer promoted Baycol to physicians. The ads touted that Bayer was "more powerful" and so effective that "84% of patients" reached their cholesterol level goals. But the warning section of the ad was

E-SERVED
10/06/04
06:22 PM ET
Baycol MDL 1431

misleading and inaccurate. In the fine print discussing the potential risks associated with the 0.8 mg dosage, Bayer lumped all clinical studies together, including those from the initial new drug application for the 0.2 mg dosage, and stated that "in clinical trials with 5,000 patients, the most common adverse events, regardless of causality, were pharyngitis, rhinitis, headache, and sinusitis." Bayer failed to inform doctors or consumers about the serious adverse reactions, including several deaths, Bayer had linked to the use of Baycol.

44. On August 8, 2001, Bayer announced that it was withdrawing Baycol from the market for public safety reasons. Bayer also finally disclosed the true extent of the dangers associated with Baycol in a letter to physicians which stated, "rhabdomyolysis is a serious, potentially fatal, adverse effect of all statin drugs, including Baycol." That same day, the FDA issued a notice linking Baycol to thirty-one deaths in the United States.

45. Despite Bayer's knowledge of the dangerous propensities of Baycol, throughout the relevant period Bayer continuously and deliberately concealed from and misrepresented to the consuming public important facts concerning Baycol's safety and efficacy.

**FIRST CLAIM FOR RELIEF**

**(Unlawful, Unfair or Fraudulent Business Practices,**

**California Business and Professions Code section 17200 et seq.)**

46. Plaintiff incorporates by reference each and every allegation set forth above with the same force and effect as though fully restated.

E-SERVED
10/06/04
06:22 PM ET
Baycol MDL 1431

47. Plaintiff asserts this cause of action on behalf of himself, the Class, and the general public of California.

48. The acts and practices engaged in by Defendants and described herein constitute unlawful, unfair and fraudulent business practices under section 17200 et seq. of the Business and Professions Code.

49. A business practice is unfair when it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers; or when the utility of defendant's conduct is outweighed by the gravity of the harm to consumers.

50. Bayer has committed acts of unfair competition, as defined by Business and Professions Code section 17200, et seq., by disseminating false, misleading, inaccurate, or deceptive information in the marketing of Baycol, and continuing to market and sell the drug even though it was aware of the adverse effects associated with Baycol.

51. Bayer has committed an act of unfair competition by violating the Federal Food, Drug, and Cosmetic Act and its implementing regulations by using false or misleading promotional material to promote Baycol.

52. Bayer has committed an act of unfair competition by violating California Business and Professions Code section 17500 by making or disseminating or causing to be made or disseminated false or misleading advertisements regarding the efficacy and safety of Baycol.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, on behalf of himself, the Class, and the general public of California, prays for relief as follows:

E-SERVED
10/06/04
06:22 PM ET
Baycol MDL 1431

A. For an order certifying this action as a class action, certifying Plaintiff as representative of the Class, and appointing his counsel to represent the Class;

B. For entry of judgment in favor of Plaintiff and the Class members and against Defendant Bayer Corporation;

C. For an order requiring Defendant to disgorge all revenues received in connection with its sale to California residents or to their agents or insurers on their behalf;

D. For an order awarding Plaintiff and the Class reasonable attorneys' fees and costs in accordance with section 1021.5 of the California Code of Civil Procedure; and

E. For an order granting such other and further relief as may be just and proper.

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury.

Dated: October 6, 2004

**GREEN & JIGARJIAN LLP**

By:________________________
Robert S. Green

Jenelle Welling
235 Pine Street, 15th Floor
San Francisco, CA 94104
Telephone: (415) 477-6700
Facsimile: (415) 477-6710